# 17-cv-07184 (KBF) (Lead Case)
# 17-cv-07199 (KBF)

## UNITED STATES DISTRICT COURT
*for the*
## SOUTHERN DISTRICT OF NEW YORK

—————————————————

In re:

THE FIRST UNION BAPTIST CHURCH OF THE BRONX,

Debtor.

———————————

TD CAPITAL GROUP LLC AND 2064 GRAND CONCOURSE LLC,

Appellants,

v.

THE FIRST UNION BAPTIST CHURCH OF THE BRONX,

Appellee.

———————————

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR APPELLANT

RAVERT PLLC

Dated:      October 18, 2017
            New York, New York

By: /s/ Gary O. Ravert
    Gary O. Ravert
    116 West 23 Street, Fifth Floor

New York, New York 10011
Tel: (646) 961-4770
Fax: (917) 677-5419
gravert@ravertpllc.com

-and-

LAW OFFICES OF LALEH HAWA
Laleh Hawa
574 Middle Neck Rd
Great Neck, New York 11023
Tel: (516) 829-5809
Fax: (516) 482-2767
laleh.hawa@hawalaw.com

*Attorneys for Appellants TD Capital Group LLC
and 2064 Grand Concourse LLC*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012 and 8014(a)(1), the undersigned counsel for Appellants TD Capital Group LLC and 2064 Grand Concourse LLC hereby certifies that neither of the Appellants has a parent corporation and or publicly-held company that own 10% or more of Appellants' common stock.

# TABLE OF CONTENTS

Page No.

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS……………………………………………………………...ii

TABLE OF AUTHORITIES………………………………………………………iv

JURISDICTIONAL STATEMENT………………………………………………vi

STATEMENT OF ISSUES WITH STANDARD
OF APPELLATE REVIEW……………………………………………………vii

I. PRELIMINARY STATEMENT……………………………………………1

II. STATEMENT OF THE CASE……………………………………………5

III. SUMMARY OF ARGUMENT……………………………………………..13

IV. ARGUMENT……………………………………………………………16

A.     THE BANKRUPTCY COURT ERRED WHEN IT GRANTED ANY
       FORM OF RELIEF FROM THE FINAL 2014 STIPULATION AND
       ORDER………………………………………………………………16
       i.     The order was a Final Order of Settlement and it was Entitled to
              Deference…………………………………………………………16

       ii.    The Debtor was Well Represented In Connection with a
              Stipulation That Clearly Set Out the Status of the Case at that
              Moment, Stipulated Facts and Lack of Other Alternatives
              and Such Stipulation Should be Enforced…………………………..19

       iii.   The Debtor Should be Estopped From Challenging the Stipulation
              it Induced…………………………………………………………23

       iv.    Res Judicata and Release Bars the Relief Granted
              in the Memorandum Decision………………………………………26

B.    THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT THE
        DEED TRANSACTION VIOLATED RPL §320…………………………27

C.    THE BANKRUPTCY COURT ERRED IN RULING THE DEED
        TRANSACTION WAS AN IMPERMISSIBLE PENALTY…………......30

V.     CONCLUSION……………………………………………………………..37

CERTIFICATE OF COMPLIANCE WITH RULE 8015(A)(7)(B) AND (C)……38

# TABLE OF AUTHORITIES

Page

*364 N.B.E. Corp. v. Edge Capital, LLC (In re 364 N.B.E. Corp.),*
2015 Bankr. LEXIS 4367 Bankr. E.D.N.Y. Dec. 29, 2015)……………………..28

*In re BG Petroleum, LLC,* 525 B.R. 260 (Bankr. W.D. Pa. 2015)……….……..16

*Carey v. Ernst*, 333 B.R. 666 (S.D.N.Y. 2005)…………………….…….….…viii

*Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.),*
2013 U.S. Dist. LEXIS 143957 (S.D.N.Y. Sept. 26, 2013)………………..…..viii

*In re Grau*, 267 B.R. 896 (Bankr. S.D. Fla. 2001)……………………………..17

*Heckler v. Comm. Health Serv. Of Crawford County Inc.,*
467 U.S. 51 (1984)…………………………………………………..…….24

*In re Hibbard Brown & Co.,* 217 B.R. 41 (Bankr. S.D.N.Y. 1998)………….…..18

*Kontrick v. Ryan,* 540 U.S. 443 (U.S. 2004) …………………………….…..22

*LaSalle National Bank v. Holland (In re Amer. Reserve Corp.),*
841 F.2d 159 (7th Cir. 1987)……………………………………….............18

*Meyerson v. Werner,* 683 F.2d 723 (2d Cir. 1982) ………..…………25, 27, 28, 29

*Mitchell v. Washingtonville Cent. Sch. Dist.,*
190 F.3d 1 (2d Cir. 1999)……………………………………………………23

*Mooney v. Byrne,* 163 N.Y. 86 (1900)……………………………………….28

*Muho v. Ball (In re Soundview Elite Ltd.),* 2014 U.S. Dist. LEXIS 172276
(S.D.N.Y. Dec. 11, 2014)………………………………………………...viii

*In re O.P.M Leasing Services, Inc.,* 23 B.R. 104 (Bankr. S.D.N.Y. 1982)…….…35

*Protective Commonwealth. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
Anderson,* 390 U.S. 414 (1968) …………………………………………..18

*Puckett v. United States*, 556 U.S. 129 (2009)…………………………………………23

*Sherman v. Novak (In re Reilly)*, 245 B.R. 768 (B.A.P. 2d Cir. 2000)…………..viii

*Southern Pac. R.R. Co. v. United States,*
168 U.S. 1, 18 S.Ct. 18, 42 L.Ed 355 (1897)…......……………………………16

*Stone v. Williams,* 970 F.2d 1043 (2d Cir. N.Y. 1992)……………………………26

*In re THW Enterprises, Inc.,* 89 B.R. 351 (Bankr S.D.N.Y. 1998) …………….....23

*Truck Rent-A-Center v. Puritan Farms 2nd, Inc.,*
41 N.Y.2d 420 (1977)………………………………………….……………31, 32, 35

*In re United Merchants and Mfrs, Inc.,* 674 F.2d 134 (2d Circ. 1982)…….....31, 32

*Weinberger v. Kendrick,* 698 F.2d 61 (2d Cir. 1982),
cert. denied, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) ...........................18

*Wygant v. Jackson Board of Education*, 476 U.S. 267 (1986)……………………17

## STATUTES

N.Y. Real Property Law §320…………………..ix, 6, 13, 14, 15, 27, 28, 29, 30, 37

N.Y. Not-For-Profit Corporation Law §511……………………………………12

11 U.S.C. §1121(b)………………………………………...............…………..5

28 U.S.C. § 158(a)(1)………………………………………………...vii, viii

28 U.S.C. § 1334……………………………………………………………vii

## RULES

Fed. R. Bankr. P. 8002……………………………………………………vii

Fed. R. Bankr. Pro. 8009……………………………………………………vii

Fed. R. Bankr. Pro. 8009(a)(1)……………………………………………vii

Fed. R. Bankr. Pro. 8014(a)(7)……………………………………………………13

Fed. R. Bankr. Pro. 9019……………………………………...………..…………3

## <u>JURISDICTIONAL STATEMENT</u>

This is an appeal from a final order of the United States Bankruptcy Court for the Southern District of New York.  The Bankruptcy Court had jurisdiction over the underlying action pursuant to 28 U.S.C. § 1334.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a)(1).  Pursuant to Fed. R. Bankr. P. 8002, Appellants timely filed Notices of Appeal on August 17, 2017 in the Main Case[1] and Adversary Proceeding[2] within 14 days of entry of the Memorandum Decision, and filed Amended Notices of Appeal[3][4] on September 13, 2017 within 14 days of entry of the Judgment entered.  The Statement of Issues[5][6] and Designation of Record[7][8] were each timely filed pursuant to Fed. R. Bankr. P. 8009(a)(1) within 14 days of the Amended Notices of Appeal.  Pursuant to Fed. R. Bankr. P. 8009, Appellants now timely file their opening brief.

---

[1] Tab 5, A0085-A0087
[2] Tab 6, A0088-A0090
[3] Tab 7, A0091-A00180
[4] Tab 8, A0181-A0270
[5] Tab 9, A0271-A0273
[6] Tab 10, A0274-A0276
[7] Tab 11, A0277-A0307
[8] Tab 12, A0308-A0338

## STATEMENT OF ISSUES WITH STANDARD OF APPELLATE REVIEW

General Standard of Appellate Review in Bankruptcy Matters

"District courts are vested with appellate jurisdiction over bankruptcy court rulings pursuant to 28 U.S.C. § 158(a)(1)." *Creamer v. Motors Liquidation Co. GUC Trust (In re Motors Liquidation Co.)*, 2013 U.S. Dist. LEXIS 143957, 9-10 (S.D.N.Y. Sept. 26, 2013).  "Th[e District] Court reviews a Bankruptcy Court's findings of fact for clear error.  A finding of fact is clearly erroneous when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been made.  Questions of law and mixed questions of law and fact are subject to de novo review." *Muho v. Ball (In re Soundview Elite Ltd.)*, 2014 U.S. Dist. LEXIS 172276, 3-4 (S.D.N.Y. Dec. 11, 2014) (internal cites and quotes omitted); *Carey v. Ernst*, 333 B.R. 666, 672 (S.D.N.Y. 2005).  "A de novo review allows us to decide the issue as if no decision had been previously rendered (citations omitted). No deference is given to the Bankruptcy Court's decision." *Sherman v. Novak (In re Reilly)*, 245 B.R. 768, 772 (B.A.P. 2d Cir. 2000).

Statement of Issues with Applicable Standard of Review for Each

1.      Did the Bankruptcy Court err by modifying, vacating and/or invalidating certain provisions of that certain court-ordered stipulation and

settlement agreement dated June 27, 2014 [Case no. 12-14099 (MEW) Docket No. 65]?  Appellants submit that this issue is subject to a de novo review.

2.      Did the Bankruptcy Court err by ruling that provisions of the Stipulation that permitted TD Capital to record the Deed are unenforceable on the basis that they violated Section 320 of the New York Real Property Law and New York common law?  Appellants submit that this issue is subject to a de novo review.

3.       Did the Bankruptcy Court err by ruling that provisions of the Stipulation that permitted TD Capital to record the Deed are unenforceable on the basis that they constituted an impermissible penalty under New York law?  Appellants submit that this issue is subject to a de novo review.

4.      Did the Bankruptcy Court err by nullifying and voiding the deed as reflected in the records of the Office of the City Register for New York City, Automated City Register Information System (ACRIS) at CRFN # 2015000192347 transferring to Appellants the real property located at 2064 Grand Concourse, Bronx, New York 10457 (the "Property") and ordering that the record ownership of the Property to be restored to Appellee The First Union Baptist Church of the Bronx as of June 2, 2015?  Appellants submit that this issue is subject to a de novo review.

TD Capital Group LLC and 2064 Grand Concourse LLC ("Appellants"), by and through their counsels, hereby submit their opening brief on appeal of the August 4, 2017 "Memorandum Decision" [Case No 12-14099 (MEW) (the "Main Case") Docket No. 119,[1] and Adv. Pro. 16-01065 (MEW) (the "Adversary Proceeding") Doc. No. 23[2]] (the "Memorandum Decision") and September 5, 2017 "Judgment and Order" (the "Judgment") in furtherance of the Memorandum Decision [Main Case Doc. No. 124[3], and Adv. Pro. Doc. No. 25[4]].  Both were entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the chapter 11 (Main Case) proceeding of *In re First Union Baptist Church of the Bronx*, and associated Adversary Proceeding *The First Union Baptist Church of the Bronx v. TD Capital Group LLC and 2064 Grand Concourse LLC*.  Appeals were filed in the Main Case and the Adversary Proceeding but just the one Memorandum Decision and Judgment were appealed.

## I.    PRELIMINARY STATEMENT

1.    This appeal flows from (i) a settlement agreement reached between a lender and a church/chapter 11 debtor that was about to lose its property in a bankruptcy sale or state court foreclosure, and (ii) whether or not Hon. Allan L.

---

[1] Tab. 1, A0001-A0039
[2] Tab. 2, A0040-A0078
[3] Tab. 3, A0079-A0081
[4] Tab. 4, A0082-A0084

Gropper[5] was empowered to authorize the settlement lifeline the church needed and the only one it had.  Appellants submit he did have that power and good public policy supports their view.  Appellee argues that he did not and that public policy supports its view.  If the Memorandum Decision is affirmed, it will bring joy to the Appellee in this case but will hurt countless other similarly situated parties in other cases.  Affirmance will handcuff lenders and will ultimately hurt other borrowers and chapter 11 debtors including the many not-for-profit and religious corporations that are currently in foreclosure or hover close to chapter 11 and for whom settlement is their only hope of retaining their properties.

2.      First Union ("First Union" or the "Debtor") was a chapter 11 debtor for almost 21 months and was poised to lose its real property located at 2064 Grand Concourse, Bronx, NY 10457 (the "Property") from which it operated.  TD Capital held a final, non-appealable foreclosure judgment (the "Foreclosure Judgment") following a duly conducted state foreclosure proceeding that began in 2010.  It is undisputed that, at the time the settlement was approved, the Debtor had no ability to satisfy the Foreclosure Judgment or retain the Property absent its consensual resolution with TD Capital.  In order to avoid the immediate loss of the Property through a bankruptcy sale or foreclosure sale, the Debtor, with the advice of counsel, an accountant, and an experienced financial advisor, and under the

---

[5] Judge Gropper presided over the settlement but retired in January 2015.  The Main Case was reassigned to Hon. Michael E. Wiles.

judicial oversight of Judge Gropper, bargained for and received from TD Capital

an additional year to refinance or sell the Property (the "Stipulation").  First Union

admitted that the "primary intention" of the settlement was to give it more time to

satisfy TD Capital.[6]  First Union moved for approval of the settlement by *verified*

motion with supporting documents pursuant to Fed.R.Bankr.Pro. 9019

(collectively, the "9019 Motion").[7]  Judge Gropper held a hearing June 27, 2014[8]

on the 9019 Motion on notice to the United States Trustee (the "US Trustee"), New

York State Attorney General ("NYS AG") and all creditors and parties in interest.

No one objected.  At the hearing, Judge Gropper concluded as follows:

> I've read the papers. I've read the settlement agreement. I appreciate that a
> great deal of effort has gone into this settlement and I realize it's painful in
> many ways but sometimes economic facts require hard choices. And I'll be
> very happy to approve the settlement unless anyone wants to be heard.[9]

Apart from an unrelated discussion about legal fees, the only words that followed

were expressions of pleasure with the settlement.[10]

3.     No one appealed the settlement approval order (the "2014 Order" and

with the "Stipulation" the "2014 Stipulation and Order").  The Debtor was unable

to arrange refinancing or a sale during the first 11 months of the Stipulation (or to-

date).  Then, after not refinancing or selling during the additional time it bargained

---

[6] Tab 21, A0645 at 81:17-22.
[7] Tab 13, A0339-A0382
[8] Tab 14, A0384-A0397
[9] Tab 14, A0388 at 5:20-25
[10] Tab 14, A0390 at 7:25 – 8:1 (US Trustee: "great job that's been done"); A0393: 10:22–11:17
(Pastor Wilson thanking court and financial advisor)

for and received, the Debtor breached the Stipulation by a payment default on June 2, 2015.[11]  Pursuant to the express and unambiguous terms of the Stipulation, TD Capital was permitted to, and did, record the deed to the Property on June 3, 2015.

4.      In February 2016, approximately 20 months after the 2014 Stipulation and Order went final and eight months after the deed was recorded, the Debtor returned to Bankruptcy Court to seek relief from the payment default.  Following the February 2016 motion to reopen, the parties had another year and a half of hearings, motion practice including TD Capital's *verified* objection[12] to the Debtor's initial request for relief, authority to move for summary judgment, [13]TD Capitals motion for summary judgment [14]and First Union' cross motion for summary judgment[15] and TD Capital's reply. [16] Though the Bankruptcy Court never actually denied the summary judgment motion and cross motion, it indicated that it could not rule on them and that a trial would be required.  Thereafter, the parties had a two-day trial on April 24 and 25, 2017 and, on August 4, 2017, the Bankruptcy Court entered the Memorandum Decision and subsequently the

---

[11] Tab 1, A0038 ("that payment did not arrive on time is not the result of excusable neglect")(internal quotes omitted).  The payment default is an established fact in the Memorandum Decision and in this appeal.  The Debtor sought relief from the payment default but in the Memorandum Decision the Bankruptcy Court declined to excuse it.  The Debtor did not appeal. (*See* A0038-39).
[12] Tab 24, A0915-A0927
[13] Tab 26, A0939.
[14] Tab 27, A0940-A1115
[15] Tab 28, A1116-A1498
[16] Tab 29, A1499-A1527

Judgment setting aside the material provision in the Stipulation that permitted TD Capital to record the deed upon a default. This appeal followed.

## II.   **STATEMENT OF THE CASE**

5.      On October 1, 2012 (the "Petition Date"), First Union filed a voluntary chapter 11 petition with the Bankruptcy Court.[17]

6.      As of the Petition Date, Carver Federal Savings Bank ("Carver") held the Judgment against First Union and on the Property.[18]  The foreclosure sale was scheduled for the Petition Date and the chapter 11 filing stayed the sale.[19]

7.      In February 2013, First Union's exclusive period expired without filing a plan of reorganization or disclosure statement.[20] *See also* 11 U.S.C. § 1121(b). On February 11, 2013, Carver filed a motion to dismiss.[21]  On May 2, 2013, Carver filed its own plan and disclosure statement (as amended, the "Carver Plan"),[22] which provided that the Property would be sold in bankruptcy.[23]

8.      On July 11, 2013, the US Trustee filed its own motion to dismiss.[24]

9.      On or about December 2013, TD Capital acquired Carver's interest in the Foreclosure Judgment and underlying loan and appeared in the Main Case.[25]

---

[17] Tab 16, A0419 at ¶10; Tab 13, A0334 at ¶8.
[18] Tab 16, A0419 at ¶¶4-7; Tab. 15, A0400-0401; Tab 13, A0344 at ¶¶6-10.
[19] Tab 16, A0419 at ¶¶9, 10; Tab. 15, A0400-0401; Tab 13, A0342 at ¶1.
[20] Tab 16, A0420 at ¶13; Tab. 15, A0401; Tab 13, A0344 at ¶12.
[21] Tab 16, A0420 at ¶13; Tab. 15, A0401; Tab 13, A0344 at ¶¶12-13.
[22] Tab 16, A0420 at ¶13; Tab. 15, A0401; Tab 13, A0344 at ¶¶12; Tab 30, A1528-A1539.
[23] Tab 30, A1533-34, Section 4 (means of effectuating plan through bankruptcy auction).
[24] Tab 16, A0420 at ¶¶14; Tab. 15, A0401; Tab 13, A0344 at ¶13.

10.     As of January 2014, First Union indisputably had no resources to pay off the obligation to TD Capital since it did not even have enough money to defend itself against the Foreclosure Judgment.[26]  At that time, absent settlement TD Capital intended to pursue dismissal or stay relief and conduct a foreclosure sale, or pursue the Carver Plan, either of which would have resulted in First Union's immediate loss of the Property.[27] Instead, TD Capital agreed to a settlement with First Union where First Union had up to another year to see if it could refinance or sell the Property at a profit.[28] The primary consideration that TD Capital bargained for in return was that, if six months passed without a sale or refinance, it would not be required to go through any further procedural steps to get paid under the settlement either in cash or in kind, but would simply record the deed in the event of default with no other recourse against the Debtor.[29]

11.     The Stipulation and 9019 Motion contained numerous acknowledgements by First Union, which are too numerous to set forth here, about the then state of affairs but which included: the validity and finality of the

---

[25] Tab 16, A0419 at ¶4; Tab. 15, A0401; Tab 13, A0343 at ¶5.
[26] Tab 31, A1540-A1572, *see* A1541 and A1545 (indicating approximately $2,000 in cash in the bank and a -$27,000 net operating loss from the Petition Date); Tab 21, A0633 at 70:7-22 (Pastor Wilson testifying that during bankruptcy case First Union looked for but could not find financing to satisfy the debt to TD Capital); Tab 13, A0343 at ¶2 (unaware of any defenses to foreclosure); A0350 ¶29 (debtor unable to formulate plan to satisfy creditors); A0351 at ¶30 (inadequate resources to even defend against the Foreclosure Judgment).
[27] Tab 13, A0352 at ¶31.
[28] Tab 13, A0364 at ¶5, A0366 at ¶9.
[29] Tab 13, A0366 at ¶10.

Foreclosure Judgment, the lack of defenses thereto, the loss of exclusivity, the

pending motions to dismiss and Carver Plan, the desire to avoid foreclosure, the

desire to preserve loss of value, and the desire to preserve the Debtor's Property

"in accordance with the Stipulation."[30]  But for the automatic stay, TD Capital had

the immediate right to enforce the Foreclosure Judgment against the Property.[31]

Each of the acknowledgements above was a reason for First Union to enter into the

settlement and each furthered the purposes of Chapter 11 by avoiding the

immediate loss of the Property in a foreclosure or bankruptcy sale.

12.    The time for First Union to redeem the Property through a refinance

or to sell it was conditionally extended as follows:  First Union was given up to

one year, through June 30, 2015 (the "Payoff Deadline"), to find refinancing to

satisfy TD Capital at the capped amount of $1,500,000 (the "Payoff Amount") or

find a buyer and sell the Property.[32]  If the Debtor breached at any time after 181

days, TD Capital's exclusive recourse was the Property, i.e., payment in kind.[33]

13.    First Union was required to make use and occupancy payments in the

amount of $9,000 monthly and such payments, including any applicable late fees,

were to be received by TD Capital no later than the last day of the month.[34]  First

---

[30] Tab 13, A0343-A0345 at ¶¶5-13; Tab 15, A0400-A0402; A0402 at ¶1.
[31] Tab 13, A0403 at ¶12(b)-13; Tab 15, A0400-A0402; A0402 at ¶1.
[32] Tab 13, A0364 at ¶5, A0366 at ¶9.
[33] Tab 13, A0407 at ¶19 (release of Debtor by TD Capital upon the final, recorded and non-appealable transfer of the deed).
[34] Tab 13, A0346 at ¶19; Tab 15, A0403 at ¶6(a)-(f).

Union was to execute a deed to be held in escrow by TD Capital, which was intended to become effective immediately after the 181st day if there was a default (the "Deed Transaction").[35]

14.     Under the Deed Transaction, TD Capital retained the right to continue the foreclosure to completion.  In that case, the deed would be recorded in the name of TD Capital's designee (here 2064 Grand Concourse LLC)[36]and the foreclosure could be completed by TD Capital without opposition so as to foreclosure junior liens, if need be.  Regardless of whether TD Capital continued the foreclosure to conclusion, once the deed was recorded by TD Capital, First Union's debt was extinguished entirely and TD Capital had no further claims against First Union for any reason.  It could only look to the value of the Property for satisfaction of its claim.

15.     The Deed Transaction lies at the heart of the 2014 Stipulation and Order and this appeal.  The 9019 Motion to approve the 2014 Stipulation and Order made crystal clear that First Union, its attorney and its financial advisor only *hoped* that there was value in the Property above the amount owed to TD Capital.[37]

---

[35] Tab 13, A0346 at ¶19, A0364-5 at ¶6, A0366 at ¶10; Tab 15, A0403 at ¶4, A405 at ¶12.

[36] The Memorandum Decision incorrectly states that 2064 Grand Concourse LLC is wholly owned by TD Capital. See A002. The pretrial order in this case, Tab. 16, indicates that it is a stipulated fact that 2064 Grand Concourse is wholly owned by the same members of TD Capital, not that it is wholly owned by TD Capital. A0418 at ¶2.

[37] Tab 13, A0363 at ¶5 ("eye toward realizing any value over and above the amount due to the secured lender. The excess value, *if any*, . . . will be used to . . . repay TD Capital [and other claims")(emphasis added), A0366 at ¶10 ("Should the debtor not be able to refinance TD Capital

The only evidence in the record of value at the time of settlement, June 2014, was

there was *no* value above TD Capital's claim.  For example, in its schedules, First

Union listed the value at $1,329,000, less than the amount due under the

Foreclosure Judgment.[38]  At trial in 2017, First Union's main witness, Pastor

Wilson, confirmed that he did not believe the Property was worth more than the

debt to TD.  He testified that he did not simply try to sell the Property in 2014

because he "wouldn't have gotten the amount that was owed to TD [Capital]."[39]

Mr. Smith testified at trial that, at the time of settlement, he believed the Property

to be worth $1.5 million.[40]  Even Thomas Campbell, a manager of Thorobird

Company LLC, which hopes to be the developer of the Property (and therefore is

an interested witness), testified that he believed the Property had an undeveloped

value of "in the million dollar range" in June of 2015 a year later. [41] Finally, Nancy

Bokhour, witness for TD Capital similarly testified that the Property was worth

less than $1.5 million at the time of settlement.[42]

16.     The weight of the evidence demonstrated no doubt that at the time

Judge Gropper approved the Stipulation, there was a significant likelihood that the

---

or sell the property for an amount in excess of $1,500,000, then in all likelihood the residual
value in the property did not exceed the amount owed to TD Capital").

[38] Tab 23, A0882.

[39] Tab 21, A0637 at 73:13-16.

[40] Tab 21, A0725 at 161:9-19.

[41] Tab 22, A0834 at 80-:11 – A0835 at 81:4.

[42] Tab 21, A0745 at 181:18 – A0746 at 182:21 (value of Property less than the amount owed to
TD Capital at the time of settlement).

Property was worth *less* than the amount owed to TD Capital.[43] Accordingly, the "first 180 days" was First Union's agreed-upon window to realize excess value—if it existed—over TD Capital's claim.  During that first 180 days, while First Union was trying to realize excess value, if there was a default, TD Capital was required to reschedule the foreclosure auction.  Thus, First Union's time to realize value would not be cut short.  It would realize excess value if it existed during the foreclosure sale.  However, once that 180 days passed, it was presumed under the Stipulation that the excess value hoped for was simply not there if there was no refi or sale.[44]  Therefore, after 180 days, if a default occurred, there was no additional requirement of rescheduling the foreclosure sale.

17.     In May 2014, First Union filed the 9109 Motion and served all creditors, the US Trustee and the NYS AG.[45]

18.     On June 24, 2014, First Union filed its final operating report showing it had almost no cash and a substantial net operating loss.[46]

---

[43] Tab 21, A0637 at 73:13-16; A0725 at 161:9-19; A0745 at 181:18 – A0746 at 182:21; Tab 22, A0834 at 80-:11 – A0835 at 81:4; Tab 13, A0363 at ¶5 ("eye toward realizing any value over and above the amount due to the secured lender. The excess value, *if any*, . . . will be used to . . . repay TD Capital [and other claims")(emphasis added), A0366 at ¶10 ("Should the debtor not be able to refinance TD Capital or sell the property for an amount in excess of $1,500,000, then in all likelihood the residual value in the property did not exceed the amount owed to TD Capital").
[44] Tab 13, A0366 at ¶10 ("Should the debtor not be able to refinance TD Capital or sell the property for an amount in excess of $1,500,000, then in all likelihood the residual value in the property did not exceed the amount owed to TD Capital").
[45] Tab 32, A1573-A1576.
[46] Tab 31, A1541 and A1545 (indicating approximately $2,000 in cash in the bank and a -$27,000 net operating loss from the Petition Date).

19.     On June 27, 2014, the Debtor, its trustees, its bankruptcy counsel and financial advisor appeared in Bankruptcy Court in support of the 9109 Motion.  No one objected and First Union, the US Trustee and the Bankruptcy Court itself expressed pleasure in the approval of the Stipulation.  That same day, the Bankruptcy Court entered the 2014 Order approving the Stipulation.  No one appealed. [47]

20.     It is undisputed that First Union was unable to refinance or sell the Property during the first 180 days.  In May 2015, just a month away from the Payment Deadline, First Union defaulted by failing to timely make the May payment.  TD Capital as a courtesy extended the due date of the May payment by a few days into early June.  When it still did not arrive, TD Capital recorded the deed in the name of 2064 Grand Concourse LLC, co-Appellant.  First Union admitted that, at that time of the default, it personally did not have the funds to satisfy the payoff amount.[48]  All First Union had at that point toward meeting the Payment Deadline was an agreement with Thorobird Company to develop the Property (the "Development Agreement")[49] *provided that* the Property was sold to Thorobird. The Development Agreement, dated just one month before the Payment Deadline, made clear that Thorobird was not obligated to do anything unless and until First

---

[47] Tab 16, A0421 at ¶¶16-18.
[48] Tab 21, A0692 at 128:3-8 (payoff funds would not be coming from First Union).
[49] Tab 25, A0928-A0938.

Union sold it the Property. There was no evidence that anyone ever tendered a $1.5 million payment to TD Capital.  At trial, the Pastor testified that Thorobird "*would have* placed $1.5 million in an escrow account" until the sale to Thorobird closed.[50] He further admitted he had nothing in writing to back up the existence of such funds.[51]  The Development Agreement and evidence made clear that any commitment by Thorobird to pay TD Capital was entirely conditioned on the Debtor drafting and finalizing a sale agreement, getting state court approval, closing on the sale of the Property, and then negotiating air rights with Thorobird.[52] Notably, a sale of real property of an insolvent religious organization requires NYS AG notice and the approval of the New York State Supreme Court.[53]  There is no evidence in the record that the approval process or paper work had even been begun as of the date of the payment default.  Thus, a sale to Thorobird, if it was approved, was likely months away.  Therefore, the Bankruptcy Court erred to the extent it determined that First Union was in any position to meet the Payment Deadline even with Thorobird's help.

21.    In February 2016, nearly two years after the 2014 Stipulation and Order became final and non-appealable, First Union returned to Bankruptcy Court

---

[50] Tab 21, A0623 at 59:15-21.
[51] Tab 21, A0692 at 128:10-17.
[52] Tab 21, A0692 at 128:14-17, A0697 at 133:17-24.
[53] McKinney's New York Not-For-Profit Corporation Law (N-PCL) § 511 (petition for court approval of sale of assets of not for profit corporation).

seeking to reopen the matter solely to extend the stipulated payment delivery date.

At the hearing on March 9, 2016, the Bankruptcy Court informed the parties that it

viewed the Stipulation as potentially violative of New York Real Property Law

§320, which holds certain conveyances to be treated as mortgages.  The

Bankruptcy Court referred the parties to certain cases and requested additional

briefing on a number of issues.  Following that briefing, which itself was followed

by the filing of the complaint in the Adversary Proceeding and answer thereto,

substantial discovery and the filing of a summary judgment motion, the

Bankruptcy Court determined a trial of certain factual issues would be required.

That trial took place on April 24th and 25th, 2017. The Memorandum Decision and

the Judgment that followed did not excuse the payment default[54] but invalidated

the Deed Transaction pursuant to RPL §320 and as an impermissible penalty.[55]

This appeal followed.

## III.   <u>SUMMARY OF ARGUMENT</u>

22.   Appellants make three general arguments in support of reversing that

portion of the Bankruptcy Court's Memorandum Decision invalidating the Deed

Transaction on any basis.  This summary is merely a summary as required by

Fed.R.Bankr.Pro. 8014(a)(7) and is therefore subject to the more detailed

expression of the arguments below.  First, the Bankruptcy Court erred when it did

---

[54] The Debtor did not appeal the refusal to excuse the payment default.
[55] Tab 1, A0024-25 (RPL §320); A0028 (impermissible penalty).

not enforce the 2014 Stipulation and Order as written.  The 2014 Stipulation and Order were entered in a bankruptcy case of a debtor who had no ability to prevent immediate foreclosure or a bankruptcy sale after duly conducted state court foreclosure proceedings and a bankruptcy.  The 2014 Stipulation and Order gave it a lifeline.  It was entered with the advice of counsel and a financial advisor after due notice to all parties in interest including the NYS Attorney General and United States Trustee.  It was entered under the judicial oversight of a highly experienced bankruptcy judge.  All parties were afforded an opportunity to object and be heard.  No one objected or voiced any reservations whatsoever.  The settlement was approved and no one appealed.  The Debtor got the benefit of the time it was afforded under the settlement.  For all of the forgoing reasons, and under the principles of waiver, forfeiture, estoppel, res judicata and release, and in furtherance of the public policy favoring settlement and for other equitable reasons applicable here, the Bankruptcy Court erred when it set aside portions of the 2014 Stipulation and Order.

23.     Second, the Bankruptcy Court erred when it concluded that the settlement was violative of RPL §320.  RPL §320 was simply inapplicable in a case like this where TD Capital had already gone through all of the state court foreclosure proceedings and obtained a judgment of foreclosure and sale.  All that was left to do at the time of settlement was schedule the foreclosure sale and it was

beyond dispute that, if TD Capital had rescheduled, the Debtor would not have been able to redeem the Property.  Thus, as set forth above, this case involved substantial judicial oversight and procedural safeguards leading to an agreement to conditionally extend the Debtor's time to redeem the Property.  Absent the agreement, the Property would have been long lost by now.  No state or federal case has ever held that a court of competent jurisdiction lacked the authority to conditionally extend a right of redemption under these circumstances.  Having induced the settlement with TD Capital, the Debtor should be estopped from challenging it as violative of RPL §320.

24.     Third and finally, the Bankruptcy Court erred when it determined that the Deed Transaction constituted an impermissible penalty under New York law. All of the evidence in the record that was needed by the Bankruptcy Court to determine if this was an impermissible penalty could be found in the four corners of the Stipulation, the 9019 Motion, and the declaration of Robert Smith in support of settlement.  All of those sources show that value was unknown at the time of settlement and, if anything, was thought to be below what was owed to TD Capital. The evidence at trial only amplified that.  Further, the "option" that the Bankruptcy Court was concerned about was not an option that expanded TD Capital's remedies, it merely allowed it to clean up title in the event there were junior liens that needed to be cut off when the deed transferred to TD Capital's designee.  The

option had no impact whatsoever on First Union obligations, which were completely and totally released and satisfied upon the recording of the deed. Therefore, the Bankruptcy Court erred to find the Deed Transaction constituted an impermissible penalty.

## IV.   ARGUMENT

### A.   THE BANKRUPTCY COURT ERRED WHEN IT GRANTED ANY FORM OF RELIEF FROM THE FINAL 2014 STIPULATION AND ORDER

25.     The Bankruptcy Court erred when it granted relief from the 2014 Stipulation and Order.  The 2014 Stipulation and Order was final and non-appealable for more than 20 months before First Union sought relief from the Bankruptcy Court.  Finality of orders serve a vital public policy purpose. *Southern Pac. R.R. Co. v. United States*, 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897) ("to secure the peace and repose of society by the settlement of matters capable of judicial determination").  As such it was entitled to substantial deference and the Bankruptcy Court erred by not giving it sufficient deference and assumed the so-ordered Stipulation was not entered by a fully informed judge.

### i.   *The Order Was a Final Order of Settlement and it was Entitled to Deference*

26.     Deference to a final order is especially important in the context of bankruptcy court-ordered settlements. *In re BG Petroleum, LLC,* 525 B.R. 260, 270 (Bankr. W.D. Pa. 2015)("settlements are strongly encouraged as a matter of

public policy because they promote the amicable resolution of disputes and lighten the litigation load of the courts."); *In re Grau*, 267 B.R. 896, 899 (Bankr. S.D. Fla. 2001)(favoring settlement where litigation costs are particularly burdensome on bankruptcy estate)(internal cites omitted).  Such deference is even more appropriate here, where that final order was from a settlement that spelled the difference between success and immediate failure of a chapter 11 debtor.  Further, it is important, as here, where the Debtor was advised by an attorney, accountant and a financial advisor and got all the settlement's "primary"[56] benefits: *additional time for the Debtor to find refinancing or sell*.  The Bankruptcy Court is a court of equity.  It does not do equity here to allow a debtor and a lender to enter into a settlement to increase the debtor's time to retain its property, allow it get the benefit of time and then wait over a year to challenge the legality of the settlement's terms. *Wygant V. Jackson Board Of Education*, 476 U.S. 267, 305 (1986) ("It would defy equity to penalize those who achieve harmony from discord …[.]")  To rule otherwise will create a powerful disincentive for lenders to settle with debtors in bankruptcy—itself an important public policy consideration.

27.    The Bankruptcy Court erred by minimizing Judge Gropper's approval of the Stipulation by suggesting that all the Debtor requested and all Judge Gropper

---

[56] Tab 14, A0388 at 5:3-11; Tab 21, A0645 at 81:17-22.

did was merely authorize the Debtor to enter into it.[57]  However, the 9019 Motion stated countless times that it sought "approval" of the Stipulation in addition to the authority to enter into it.[58]  The Supreme Court has held that the bankruptcy court has a duty to apprise itself of all facts necessary to evaluate the settlement and make an "informed and independent judgment" as to whether the compromise is fair and equitable.  *LaSalle Nat'l Bank v. Holland* (*In re Amer. Reserve Corp.*), 841 F.2d 159, 162-63 (7th Cir.1987) (quoting *Protective Commonwealth. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).  The court's analysis is to include the "substantive terms" of the settlement as well.  *Hibbard Brown & Co.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998)(citing *Weinberger v. Kendrick,* 698 F.2d 61, 73 (2d Cir .1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (in turn quoting *TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–425).  The Bankruptcy Court assumed that Judge Gropper did not independently analyze it and further concluded that, if he had, he would "undoubtedly . . . refused to approve that result."[59]  Appellants disagree.  As Judge Gropper well knew at the time that refusal to approve the Stipulation meant

---

[57] Tab 1, A0004 ("authorized First Union to enter into the Stipulation"), A0023 ("only issue presented to the Court when the Parties sought approval of the Stipulation was whether First Union could enter into it"), A0031 (no indication that "so-ordered" meant anything other than authority to enter into Stipulation).

[58] Tab 13, A0339 (in title and in introductory paragraph), A0341 (same), A0342 at ¶2, A0345 at ¶17, A0346 at ¶19, A0349 at ¶27, A0350 at ¶29, A0351 at ¶30, A0352 at ¶31, A0353 at ¶32, A0354 at ¶¶35-36, and A0355 at ¶38).

[59] Tab 1, A0023.

only one thing:  the Debtor would have lost the Property almost immediately

because it was wholly incapable of satisfying the debt.  Thus, the settlement was

First Union's only hope.

28.     At the Settlement Hearing, no one objected.  The Debtor put on the

record that the

> agreement . . . gives the debtor time, which is what the debtor is looking for
> at this point in order to come up with a payoff amount to satisfy this
> mortgage debt. . . . The creditor is giving us until June [2015], so another
> year to come up with those funds.[60]

With no objections heard, and with the vocal support of the Debtor, the Pastor, and

the U.S. Trustee, Judge Gropper made the following comment worth repeating:

> I've read the papers. I've read the settlement agreement. I appreciate that a
> great deal of effort has gone into this settlement and I realize it's painful in
> many ways but sometimes economic facts require hard choices. And I'll be
> very happy to approve the settlement unless anyone wants to be heard.[61]

The 2014 Order he entered specifically states that the Stipulation "is hereby

approved and so-ordered."[62]

### ii.     *The Debtor was Well Represented In Connection with a Stipulation That Clearly Set Out the Status of the Case at that Moment, Stipulated Facts and Lack of Other Alternatives and Such Stipulation Should be Enforced*

29.     The Debtor entered into the Stipulation knowingly, voluntarily, and

was represented by experienced counsel, an experienced financial advisor and an

---

[60] Tab 14, A0388 at 5:3-11.
[61] Tab 14, A0388 at 5:20-25.
[62] Tab 15, A0398.

accountant.[63] The evidence overwhelmingly shows that the settlement was the only

feasible option to prevent immediate loss of the Property.[64] The Stipulation recited

that the purpose of the settlement was "to avoid foreclosure, preserve loss of value,

and to preserve the Debtor's Property *in accordance with this Agreement[.]*"[65] The

First Union Board of Trustees unanimously authorized approved it.[66]  The Debtor

stipulated to the "sufficiency" of the "consideration[.]"[67]  The Board of Trustees

were aware and acknowledged that the settlement could result in the loss of the

Property.[68] The financial advisor, Robert Smith, put in a lengthy declaration

voicing the reasons for settlement and strong support for it.[69]  It is impractical to

incorporate the full text of the Smith Declaration into this brief but it presented the

single most persuasive evidence in the record below that the terms of the

Stipulation were fair and reasonable and, most importantly, represented the only

---

[63] Tab 15, A0410 at ¶27 ("fully understands the terms"), ("informed decision")("assistance of counsel"); Tab 14, A0342 at ¶2 (assistance of financial advisor); Tab 13, A0363 ("[a]ll parties have been represented by competent, experienced, and focused bankruptcy counsel and all parties have been well served in the vigorous negotiation process.").
[64] Tab 14, A0342 at ¶2 (best option was settlement); Tab 31, *see* A1541 and A1545 (indicating approximately $2,000 in cash in the bank and a -$27,000 net operating loss from the Petition Date); Tab 21, A0633 at 70:7-22 (Pastor Wilson testifying that during bankruptcy case First Union looked for but could not find financing to satisfy the debt to TD Capital) Tab 13, A0343 ¶2 (unaware of any defenses to foreclosure); A0350 at ¶29 (debtor unable to formulate plan to satisfy creditors); A0351 ¶30 (debtor unable to even finance defense).
[65] Tab 15, A0402.
[66] Tab 13, A0382.
[67] Tab 15, A0402.
[68] Tab 13, A0382 (The Resolution went on to state that the Settlement Agreement would permit the "*disposal or retention of the real property* in a manner that is in the best interests of the [church] and its creditors after good faith marketing has taken place.")(emphasis added)).
[69] Tab 13, A0362-A0367.

reasonable hope for the Debtor to keep the Property.  The reasons were simple and

comprehensible to all, including Judge Gropper, especially the fairness of the deed

in escrow provision:

> If . . . the Debtor defaults after the 181st day, than the deed may be
> recorded by TD Capital without further order of this Court. This was a
> heavily negotiated term that gives TD Capital finality in the event of a
> default after 181 days have passed. TD Capital was insistent
> throughout the negotiations that it wanted finality in the event the
> debtor does not maintain the monthly payment . . .  The "deed in lieu"
> construct provides just such finality while allowing the debtor ample
> time to explore all available alternatives. Should the debtor not be able
> to refinance TD Capital or sell the property for an amount in excess of
> $1,500,000, *then in all likelihood the residual value of the property
> did not exceed the amount owed to TD Capital*. While the debtor
> incurs some risk as to value realization if it defaults prior to June 30,
> 2015, the debtor could conceivably conduct its own quick sale or
> auction at any [time] during that period if it sees that its financial
> condition is materially declining. In such a scenario, the debtor is
> theoretically no worse off than it would be in a contested proceeding
> today.[70]

30.    The Debtor specifically stipulated, among other things, that (i) TD

was entitled to rely on the recitals (for example the sufficiency of consideration);[71]

(ii) but for the automatic stay, TD would be entitled to immediately enforce its

Judgment against the Property;[72] (iii) the Foreclosure Judgment and action

remained in full force and effect until the Debtor completes each and every term of

the settlement;[73] (iv) in the event of default, TD shall be permitted to record the

---

[70] Tab 13, A0366 at ¶10 (emphasis added).
[71] Tab 15, A0402.
[72] Tab 15, A0402 at ¶1.
[73] Tab 15, A0403 at ¶3.

deed so long as 180 days have passed;[74] (v) the Debtor shall not interfere in any

manner with TD's exercise of its rights and remedies under the settlement, the

Foreclosure Judgment or under applicable law;[75] and (vi) time is of the essence

with respect to all of the Debtor's obligations.[76]  Every one of the above

stipulations should have been a bar to relief in the Bankruptcy Court.  Among the

stipulations was a stipulation to make "use and occupancy payments,"[77] which the

Bankruptcy Court wrongly found were disguised interest payments.[78]  Not only

were such payments stipulated to be use and occupancy, their amount bore no

relation to any interest rate related to the Foreclosure Judgment.

31.     The 9109 Motion and Stipulation, and the numerous provisions and

stipulated facts therein, were filed with the Bankruptcy Court on notice to all

parties, the US Trustee and the NYS AG.   No one objected or appealed.  The

Debtor had the benefit of counsel and a financial advisor under the supervision of

Judge Gropper.  Thus, the Bankruptcy Court erred in not finding that the Debtor

waived and/or forfeited any right to challenge the terms of the Stipulation *after* it

failed to object and received the benefits of same.  *Kontrick v. Ryan*, 540 U.S. 443,

459 (U.S. 2004) (affirming lower court finding of waiver for failing to timely raise

---

[74] Tab 15, A0403 at ¶6(f), A0403 at ¶12.
[75] Tab 15, A0408 at ¶20.
[76] Tab 15, A0408 at ¶24.
[77] Tab 15, A0403 at ¶5; Tab 21, A0656 at 92:17-21 (Pastor testifying payments were use and occupancy).
[78] Tab 1, A0003.

defense); *In re THW Enterprises, Inc.*, 89 B.R. 351, 357 (Bankr. S.D.N.Y. 1998)(waiver of right in bankruptcy); *see also Puckett v. United States*, 556 U.S. 129, 134 (2009) (on forfeiture, "a right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it.")(internal cite omitted).  Clearly, if a right affecting personal freedom may be waived or forfeited in a criminal matter, certainly a court of competent jurisdiction can conditionally extend a civil law right of redemption.

### iii.     The Debtor Should be Estopped From Challenging the Stipulation it Induced

32.     Both judicial and equitable estoppel should bar the relief granted by the Bankruptcy Court.  The Debtor claimed that the Deed Transaction violated RPL §320 and was a penalty under state law.  The Debtor should be estopped from taking a position contrary to the plain wording of the Stipulation when the Debtor induced the Stipulation, then TD Capital dropped its pursuit of the Carver Plan or dismissal or stay relief and foreclosure, and then the Debtor received the primary benefit of time from the Stipulation.  Judicial estoppel applies where "(1) the party against whom the estoppel is asserted took an inconsistent position in a prior proceeding and (2) that position was adopted by the first tribunal in some manner, . . . such as by rendering a favorable judgment." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999) (internal cites omitted).  The Debtor never raised RPL §320 at the time of the settlement, when it could have been addressed

before the parties changed positions in reliance on the terms of the Stipulation. The Debtor also specifically argued that settlement was fair and then stipulated to the sufficiency of the consideration.  It then sought and obtained court approval on that basis and then obtained the primary benefit of the Stipulation—additional time.[79] Accordingly, the Debtor should be judicially estopped from challenging the material terms of the Stipulation since it already obtained the additional time it bargained for.

33.     The Debtor is also equitably estopped from challenging the terms, including stipulated facts therein, of the Stipulation.  Equitable estoppel applies where a party, here the Debtor, "makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it" and the other party, here TD Capital, "in reliance upon the misrepresentation . . .  change[s] [its] position [so] that it would be unjust to deprive him of that which he thus acquired."  *Heckler v. Comm. Health Serv. of Crawford County, Inc.*, 467 U.S. 51, 59 (1984).  TD Capital reasonably relied on the representations of the Debtor, its counsel, and financial advisor that the settlement was fair and reasonable, would be binding on the Debtor, would not be challenged, and would give TD Capital the finality it bargained for.  In reliance on representations, TD Capital dropped its plan to pursue the Carver Plan or to push for dismissal or stay relief so as to

---

[79] Tab 14, A0388 at 5:3-11; Tab 13, A0343; A0350 at ¶29; A0356 at ¶43, A0357 at ¶45, A0366 at ¶10, A0382 ("limited period of time to market the real property").

foreclosure immediately.  Had the Debtor not made such representations, TD

Capital would have foreclosed more than 3 years ago and the Debtor would have

lost the Property.  Instead, TD Capital agreed to give First Union additional time

and is now being punished for it even though it was the Debtor that defaulted and

failed to use its time to refinance or sell the Property.  Affirming the Bankruptcy

Court's ruling will ensure that lenders will never risk entering into settlement

agreements with Debtors to give them more time.  Instead, lenders will be left with

just one option:  push for prompt foreclosure. This does not serve debtors or

borrowers.  It does not serve the judicial system or public policy.

     34.     Under the *Meyerson* case, addressed at length in the Memorandum

Decision and a case very similar to this one, the District Court found that the

defendants

> were estopped by reason of their representations, upon which plaintiffs
> had relied, from denying the effectiveness of the deed of transfer.

*Meyerson v. Werner*, 683 F.2d 723, 725 (2d Cir. 1982).  The Second Circuit added

that the defendants were

> estopped from challenging the terms of the . . . agreement and court
> order since they induced the plaintiffs to enter into it and the court to
> approve it by representing that an absolute deed . . . was being given
> and the plaintiffs relied thereon to their detriment, refraining from
> taking steps that would have resulted in [a sale of the property at issue.]

*Id*. at 728.  The agreement in *Meyerson* is similar to the settlement herein in that

*Meyerson* allowed a deed transfer pursuant to a court order as part of a conditional

settlement where the benefits vastly outweighed the alternative to not settling.

Accordingly, the Debtor should be equitably estopped from disclaiming its terms

after it induced and received the benefits to TD Capital's detriment.

### iv.    *Res Judicata and Release Bars the Relief Granted in the Memorandum Decision*

35.    The relief granted should have been barred by res judicata.

> Generally, res judicata (claim preclusion) operates to prevent the parties or their privies to a prior action from litigating any matter that was or *could have been decided in a previous suit.*"

*Stone v. Williams*, 970 F.2d 1043, 1054 (2d Cir. N.Y. 1992)(internal cites

omitted)(emphasis added).  Here, had a party timely objected, the Court could have

conceivably decided not to approve the Stipulation and by now the Property would

have been sold in a bankruptcy sale or foreclosure.  No one wanted that outcome,

nor did anyone even want to risk it.

36.    Further, the Debtor released TD Capital and 2064 Grand Concourse

from all claims under the Stipulation that Judge Gropper approved:

> As a material part of the consideration for this Agreement, the Debtor hereby unconditionally and irrevocably releases and forever discharges TD Capital (including any entity taking title to the Property pursuant to any transfer contemplated herein*)* . . . [from all claims], known or unknown, . . . arising from or relating to any alleged act, occurrence, omission or transaction occurring or happening prior to the date of this Agreement.[80]

---

[80] Tab 15, A0407 at ¶17.

That release included "any entity taking title" making it clear that the Debtor understood that, as it expressly acknowledged in the Resolution,[81] it could lose the Property in the event it failed to refinance or sell or if it defaulted at any time.

### B. THE BANKRUPTCY COURT ERRED IN CONCLUDING THAT THE DEED TRANSACTION VIOLATED RPL §320

37.     The Bankruptcy Court erred in its conclusion that the Deed Transaction was a mortgage under New York Real Property Law §320.  The Deed Transaction was never anything other than a court-ordered, conditional extension of the time the Debtor had to refinance or sell the Property with a limited right to redeem if it went to a foreclosure sale.  It gave the Debtor the lifeline that it needed but conditions were placed on it.

38.     Notwithstanding all of the citations to state court and federal cases, there has not been a single case cited by First Union or the Bankruptcy Court, including in the Memorandum Decision, showing that a state or federal court of competent jurisdiction lacks the power to approve a settlement under these circumstances.  The only case that is similar to the facts of this one is *Meyerson*. The *Meyerson* court entered an order, in a case similar to this one, and that case did not even involve a final judgment of foreclosure and sale following state court foreclosure proceedings.  *Meyerson* demonstrates that the federal court, with adequate judicial oversight, has the power to approve such a settlement even in the

---

[81] Tab 13, A0382 ("disposal or retention of property").

absence of a foreclosure judgment.  The Bankruptcy Court's reading of the case

law on the equitable right of redemption is problematic because it reads the right of

redemption as so sacrosanct that it could be used to a debtor's detriment.  In other

words, if the court does not have the power to conditionally extend a right of

redemption, a debtor's only option is to satisfy the judgment now or face

immediate loss of the property (and with it any hope of redemption).  How does

immediately loss of the property serve members of a congregation or a not-for-

profit.  TD Capital submits that the law is not as absolute as the Bankruptcy Court

held and such a reading is antithetical to the public policies behind title 11 and

RPL §320.

39.     Further, the Bankruptcy Court cites *Mooney v. Byrne*, 163 N.Y. 86

(1900) for the proposition that the equitable right of redemption cannot be waived

or abandoned.  However, neither waiver nor abandonment of redemption rights

apply here because the right of redemption is inapplicable in a case where the

transfer was pursuant to a court order.  *364 N.B.E. Corp. v. Edge Capital, LLC (In

re 364 N.B.E. Corp.)* 2015 Bankr. LEXIS 4367, *11 (Bankr. E.D.N.Y. Dec. 29,

2015) (citing *Meyerson v. Werner,* 683 F.2d 723, 727).  Yet, even if that were not

the case, the New York State Court of Appeals made clear in *Mooney* that a

defendant had the right of redemption until "she redeemed, or *her right was cut off

by a court of competent jurisdiction*." *Mooney v. Byrne*, 163 N.Y. 86, 94 (emphasis

added). Here it is undisputed that the Bankruptcy Court was court of competent jurisdiction and that it limited the Debtor's right of redemption at the Debtor's own request and urging because the Debtor needed more time to redeem and TD Capital was willing to give it.

40. In sum, RPL §320 simply does not apply to the facts here because Judge Gropper approved the Deed Transaction as part of a court-ordered settlement, which had the effect of increasing not abridging any right of redemption. The state court foreclosure procedural safeguards had already taken place at the time of settlement. The federal court procedural safeguards were in place. The Debtor was in federal bankruptcy court trying to find a way to avoid immediate foreclosure. Debtor's counsel stated on the record at the settlement hearing that the agreement was to give the Debtor more time. [82] The Pastor testified at trial that the "primary intention" of the settlement was to give the Debtor more time.[83] The settlement had Judge Gropper's oversight, the advice of counsel, an accountant, and the advice of a financial advisor, each of which was a protection against creditor "overreach[]", which the Meyerson court was concerned with. *Meyerson,* 683 F.2d 723, 727. In fact, the Meyerson court specifically noted that "ordinarily" parties cannot waive the provisions of RPL §320. *Id.* The instant case is not ordinary. Judge Gropper and the parties at the time understood the

---

[82] Tab 14, A0388 at 5:3-11.
[83] Tab 21, A0645 at 81:17-22.

consequences of refusing to approve the settlement and TD Capital submits such

approval should not be disturbed.  Here, there was sufficient federal judicial

oversight to justify approval of the settlement and any other conclusion is contrary

to the undisputed facts demonstrating that this transaction was not "intended only

as a security in the nature of a mortgage." RPL §320.

### C.   THE BANKRUPTCY COURT ERRED IN RULING THE DEED TRANSACTION WAS AN IMPERMISSIBLE PENALTY

41.   The Bankruptcy Court erred in holding that the Deed Transaction

constituted an impermissible penalty under state law.  As set forth above, the

Debtor stipulated to the fairness of the consideration,[84] which was discussed

numerous times in the 9109 Motion and supporting declaration of Mr. Smith.[85]  No

one objected or even raised a concern because everyone knew that the value was

unknown (if not low) and would be proven through refinance or a sale in the

months after approval.  The Debtor neither refinanced nor sold.  In fact, in cross

examination at trial, the Pastor admitted that right after the 2104 Stipulation and

Order was entered, he could not sell that Property because he would not receive

even the amount TD Capital was owed leaving further debt.[86]  The value was

simply not there over the amount TD Capital was owed at the time of the

Stipulation.  The relevant time for the Court to measure value is the time of

---

[84] Tab 13, A0366 at ¶10; Tab 15, A0402.
[85] Tab 13, A0351 at ¶29, A0354 at ¶35, A0366 at ¶¶9, 10.
[86] Tab 21, A0637 at 13-16.

settlement.  *See United Merchs. & Mfrs., Inc.*, 674 F.2d 134, 142 (2nd Cir. 1982);

*Truck Rent-A-Center v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977).

42.    At the time of settlement, the Debtor's financial advisor, Mr. Robert

C. Smith, a qualified expert in the field of financial advisory services supported the

9019 Motion with a declaration under penalty of perjury stating why the terms of

the Stipulation were financially sound, fair, reasonable and, most importantly, in

the best interest of the Debtor and all creditors.  Mr. Smith stated as follows:

> In my opinion, given the circumstances, ***the consideration to be exchanged under the Agreement is reasonable***. In exchange for the clear security that TD Capital gets by the execution of a deed in the escrow, ***TD Capital is giving the Debtor a full year to refinance or sell the Property*** as set forth in more detail in the Agreement. The debtor intends to immediately list the property for sale and to explore any and all refinancing options, including a long term solution with TD Capital. ***As further protection for the Debtor in the event there is a default in the first 180 days, TD Capital will notice the foreclosure sale just as it would if the stay were lifted and TD Capital returned to state court. That would give the Debtor a final opportunity at redemption of the Property*** before the gavel comes down. ***To the extent there was residual value in the property, such value would inure to the debtor.***

> If 180 days passes after approval and the Debtor has not been able to market or refinance the Property, and if the Debtor defaults after the 181st day, than the deed may be recorded by TD Capital without further order of this Court. This was a heavily negotiated term that gives TD Capital finality in the event of a default after 181 days have passed. ***TD Capital was insistent throughout the negotiations that it wanted finality*** in the event the debtor does not maintain the monthly payment or repay the obligation by June 30, 2013. The "deed in lieu" construct provides just such finality while allowing the debtor ample time to explore all available alternatives. ***Should the debtor not be able to refinance TD Capital or sell the property for an amount in excess of $1,500,000, then in all likelihood the residual value of the property did not exceed the amount owed to TD Capital.*** While the debtor

*incurs some risk as to value realization if it defaults* prior to June 30, 2015, the debtor could conceivably conduct its own quick sale or auction at any [time] during that period if it sees that its financial condition is materially declining. In such a scenario, the debtor is theoretically no worse off than it would be in a contested proceeding today.[87]

43.    The Bankruptcy Court does not appear to have even considered this sworn statement submitted in support of the 9109 Motion.  Instead, the Bankruptcy focused on any evidence in the record that tended to support that TD Capital might have received more that it was owed and in particular focused on the purported value in June of 2015 long after the Stipulation was approved.  The Bankruptcy Court found, based on trial testimony of Mr. Campbell, an interested real estate developer with a close relationship with First Union and its counsel, that in June 2015 "the Property had a value . . . that was well in excess of the remaining amounts due to TD Capital."[88]  First, as noted above, the value as of 2015 is not relevant in a liquidated damages analysis. *United Merchs.*, 674 F.2d at 142; *Truck Rent-A-Center*, 41 N.Y.2d at 425.  Even if it was, on cross examination, Campbell admitted that in June 2015 the Property that Thorobird "would build for [First Union]" would be worth more than the $1.5 million owed to TD Capital at that time but never stated the Property as it stood in June 2015 was worth any particular amount more than $1.5 million.  On cross examination, Campbell confirmed this by testifying that the difference between the land value, undeveloped, and the

---

[87] Tab 13, A0366 at ¶¶9,10 (emphasis added).
[88] Tab 1, A0005-A0006.

developed property is the difference between something worth "in the million dollar range" and $30 million.[89]  Thus, even if the June 2015 value was relevant, there was no evidence in the record that the actual value of the Property at that time was any higher than the debt.  Only as fully developed would the value have been substantially higher.

44.    The Bankruptcy Court erred when it concluded that the evidence showed that at the time of settlement the parties believed that the Property "value might well increase[.]"  The Pastor testified that he did not try to simply sell the Property in 2014 to satisfy the debt because he "wouldn't have gotten the amount that was owed to TD [Capital]."[90]  Value at the time of settlement was thus a central issue in the chapter 11.  The Bankruptcy Court erred by concluding against the weight of the evidence that the parties believed the value might increase.  The Bankruptcy Court also erred when it gave undue weight to a witness with a pecuniary interest in the case over the disinterested financial advisor Mr. Smith.  Smith's declaration in support of the 9019 Motion acknowledged that in negotiating the settlement it was contemplated that First Union would either refinance or sell the Property within the first 180 days.  That First Union was unable to undercuts any finding that there was ever any material value over TD Capital's claim. Further, Mr. Smith testified at trial that, at the time of settlement,

---

[89] Tab 22, A0834 at 80:11- A0836 at 81:4.
[90] Tab 21, A0637 at 13-16.

he believed the Property to be worth approximately $1.5 million.[91]  As noted
above, even Campbell, who is financially interested in the outcome of this appeal,
testified that a year later the Property only had a value in the million dollar range.[92]
Thus, any value above that was merely a hope and not worth the risk of litigating
over settling.  Finally, Nancy Bokhour, testified for TD Capital that the Property
was worth less than $1.5 million at the time of settlement.[93]

45.      Mr. Campbell is a real estate developer who had a pecuniary interest
in keeping the Property in First Union's hands so Thorobird could develop it.  The
Bankruptcy Court gave undue weight to the fact that the Debtor and Thorobird
entered into the Development Agreement.  As only the first step in a long process,
the Court should not have given the Development Agreement or Campbell
testimony any weight at all because the Agreement was clear that it provided for a
payoff to TD Capital only upon the transfer of the Property to Thorobird.  As
noted, a sale to Thorobird would have required NYS AG and New York State
Supreme Court approval and there is no evidence that such process was even
begun.  Therefore, any testimony that TD Capital was going to be paid imminently
was disingenuous.  As of May 31, 2015, the date of the Development Agreement

---

[91] Tab 21, A0725 at 161:9-19.
[92] Tab 22, A0834 at 80-:11 – A0835 at 81:4.
[93] Tab 21, A0745 at 181:18-A0746 at 182:21.

and contemporaneous with the payment default, satisfaction of the Payment Deadline was little more than a hope.

46.    "Under New York law, a liquidated damages clause is valid if: (1) actual damages are difficult to determine, that is not "readily ascertainable" and (2) the sum is a reasonable estimation of potential damages, i.e., not "plainly" disproportionate" to the possible loss. If such a contractual provision cannot meet both of these two requirements, it is deemed a "penalty" and will not be enforced. *In re O.P.M. Leasing Services, Inc.*, 23 B.R. 104, 111 (Bankr. S.D.N.Y. 1982)(citing *Truck Rent-a-Center,* 41 N.Y.2d at 425).

47.    The Bankruptcy Court erred when it concluded that damages were easy to calculate and the payment was plainly disproportionate.  At the time of the settlement, the Property was believed to worth $1.5 million or less.  Thus, the "damages" of waiting and ultimately being paid in kind, i.e. with the Property, were certainly unknown and impossible to calculate at the time of settlement. Without knowledge of the value of the Property at the time, one cannot know TD Capital's damages.  Therefore, the deed in lieu could not have been said to be plainly disproportionate to what was owed.  The deed in lieu provision was utilized because all parties knew that there was a possibility of either no timely sale or no timely refinance and that TD Capital might end up with the Property.  There was substantial uncertainty, as the Stipulation makes clear, as to the value of the

Property and both sides took a risk.  Accordingly, that the damages and value was not readily ascertainable nor plainly disproportionate to what was owed. The Deed Transaction, therefore, is properly considered a liquidated damages clause.

48.     The Court was also concerned with the purported "option" that TD Capital held concerning the possibility of completing the foreclosure process even after the 181 day.  The Bankruptcy Court found that the option rendered the Deed Transaction impermissible.[94]  This issue came up at the summary judgment hearing and was discussed and explained on the record.[95]  The option to continue the foreclosure to completion in the name of TD Capital's designee related to cleaning up title and had no bearing on First Union's obligation to TD Capital.  Once the deed was recorded, First Union's debt was extinguished completely and permanently.  That is undisputed in this case.  There was no option to collect more money from the Debtor even if the Property at the time of the transfer was worth no more than a peppercorn.  TD Capital completely and absolutely waived any right to any further recovery from the Debtor once the deed transferred even if the value was insufficient to pay off the $1.5 million.  The "option" that TD Capital had was to take its deed in lieu and complete the foreclosure to wipe out any junior liens that may be on the Property in order to obtain clear title.  This is a normal occurrence in deed in lieu transactions and TD Capital would have been foolish not

---

[94] Tab 1, A0026.
[95] Tab 33, A1634 at 58:6-24.

to preserve that right, which is afforded to any lender that takes a deed in lieu.  For all of the foregoing reasons, the Bankruptcy Court erred in concluding that the Deed Transaction was an impermissible penalty for any reason.

## V.    <u>CONCLUSION</u>

49.    For all of the reasons set forth above, Appellant requests that this Court (i) reverse the Bankruptcy Court's Memorandum Decision to the extent it invalidated the Deed Transaction as violative of RPL §320 or as an impermissible penalty, (ii) vacate the Judgment to the extent it set aside the transfer of the deed to 2064 Grand Concourse LLC and to the extent it invalidated the Deed Transaction as violative of RPL §320 or as an impermissible penalty, (iii) dismiss the Adversary Complaint in all respects; (iv) grant Appellants' motion for summary judgment, and (iv) grant such other and further relief as this Court deems just and proper.

END

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 8015(A)(7)(B) AND (C)</u>

This brief complies with the type-volume limitation of rule 8015(a)(7) because this brief contains 8,696 words, excluding the parts of the brief exempted by rule 8015(a)(7).

October 18, 2017                                    RAVERT PLLC

<u>/s/Gary O. Ravert</u>
Gary O. Ravert

# 17-CV-7199 (KBF)

**UNITED STATES DISTRICT COURT**
*for the*
**SOUTHERN DISTRICT OF NEW YORK**

_____

In re:


THE FIRST UNION BAPTIST CHURCH OF THE BRONX,

Debtor.

_____


TD CAPITAL GROUP LLC AND 2064 GRAND CONCOURSE LLC,

Appellants,

v.

THE FIRST UNION BAPTIST CHURCH OF THE BRONX,

Appellee.

_____

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**CERTIFICATE OF SERVICE**


RAVERT PLLC

Dated:     October 18, 2017
           New York, New York

By: /s/ Gary O. Ravert_____
    Gary O. Ravert
    116 West 23 Street, Fifth Floor
    New York, New York 10011

Tel: (646) 961-4770
Fax: (917) 677-5419
gravert@ravertpllc.com

-and-

LAW OFFICES OF LALEH HAWA
Laleh Hawa
574 Middle Neck Rd
Great Neck, New York 11023
Tel: (516) 829-5809
Fax: (516) 482-2767
laleh.hawa@hawalaw.com

*Attorneys for Appellants TD Capital Group LLC
and 2064 Grand Concourse LLC*

## CERTIFICATE OF SERVICE

1.      I, Gary O. Ravert, am not a party to the above-captioned action, am over 18 years of age, and reside in Brooklyn, New York.

2.      On October 18, 2017, via email I served each of the recipients on the attached Service List below with a true and correct copy of the

- Appellants' Opening Brief and Appendix

Dated: October 18, 2017                    RAVERT PLLC
         New York, New York

                                                     By: Gary O. Ravert

**SERVICE LIST**

Appellee's counsel:

David J. Abrams (dabrams@kasowitz.com, autodocket@kasowitz.com, courtnotices@kasowitz.com); Andrew Harry Elkin (aelkin@kasowitz.com, autodocket@kasowitz.com, courtnotices@kasowitz.com); Isaac Sasson (ISasson@kasowitz.com); Susan Chase (shchase@legal-aid.org); Emily Kuznick (EKuznick@kasowitz.com)