USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 7, 2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
In re:

THE FIRST UNION BAPTIST CHURCH OF
THE BRONX,

                       Debtor,
-------------------------------------------------------------
TD CAPITAL GROUP LLC and 2064 GRAND
CONCOURSE LLC,

                       Appellants,

                       -v-

THE FIRST UNION BAPTIST CHURCH OF
THE BRONX,

                       Appellee.
------------------------------------------------------------ X

17-cv-7184/17-cv-7199
(KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      Somewhere well past the eleventh hour and indeed quite close to midnight, when a state foreclosure proceeding had been completed and an auction scheduled of property owned by the First Union Baptist Church ("First Union"), located at 2064 Grand Concourse, Bronx, New York 10457 (the "Property"), First Union obtained a judicially sanctioned reprieve. The reprieve was in the form of a vigorously negotiated settlement agreement (the "Agreement") entered into between the lender, TD Capital Group ("TD"), and First Union. The terms of the Agreement reflected a complex set of negotiated terms—none more important than one: in the event of any ultimate default, and even then after the expiration of yet another waiting period,

TD would be able to record a deed in lieu. The Agreement provided for a series of events that had to occur before any recordation—but it also provided that if and when they did occur, it would signal that the arrangement was at an end. According to the carefully-negotiated structure of the Agreement, TD was providing First Union with time to solve difficult financial issues associated with the Property, and First Union was in turn committing that if it failed in its efforts, TD would then have peace.

This appeal arises from First Union's attempt to avoid the clear and enforceable terms of the Agreement. The facts in the record demonstrate that First Union was unable to comply with its obligations under the Agreement; the record suggests various reasons why that may have been so, but none ultimately matter. Consistent with its core right that held together the web of interrelated terms in the Agreement, TD then recorded the deed in lieu. More than six months passed before First Union sought to reopen the bankruptcy proceeding in which the Agreement had played such a significant role, and sought an order voiding the recordation. By this time, the judge who had presided over the Agreement had retired. The newly assigned judge ultimately held a hearing, and found in First Union's favor.

Now before the Court is an appeal of that decision and order. For the reasons set forth below, this Court finds that the Bankruptcy Court erred. Fundamentally, the Agreement that provided for the deed in lieu is not a mortgage, or akin to a mortgage, that under New York law would require a right of redemption, thereby voiding recordation as it occurred here. The terms of the Agreement providing for

2

recordation are enforceable and do not constitute an inappropriate penalty. Instead, on its face, and without resort to extrinsic evidence (rendering the factual hearing that occurred unnecessary), the deed in lieu was one of a number of interdependent terms in an Agreement that first and foremost provided relief to a debtor whose rights to the Property were plainly and unambiguously at an end. The Agreement was an arrangement between a creditor and debtor that provided give and take on a number of items, and the deed in lieu was a bargained-for term, as part of a negotiated exchange.

The Court therefore REVERSES the Bankruptcy Court's Judgment dated August 4, 2017, and grants appellants' requested relief.

I. FACTUAL BACKGROUND

A. Judgment of Foreclosure against First Union

On April 25, 2003, First Union obtained a mortgage on the Property from Carver Federal Savings Bank ("Carver") in the principal amount of $1,120,000. (Appendix to Brief for Appellant ("App."), A0419 ¶ 4.) On May 1, 2010, it defaulted. (Id. ¶ 5.) On July 17, 2012, Carver obtained a judgment of foreclosure (the "Foreclosure Judgment") and a foreclosure sale was scheduled for October 1, 2012. (Id. ¶¶ 6–9.)

On October 1, 2012, First Union filed for bankruptcy under Chapter 11 of the Bankruptcy Code (the "Chapter 11 Proceeding"). (Id. ¶ 10.) The automatic stay provided for under the bankruptcy rules prevented the foreclosure sale from

occurring. On May 2, 2013, after First Union had failed to timely file a plan of reorganization, Carver filed a plan providing for sale of the Property.

On or about December 2013, TD acquired Carver's interest in the Foreclosure Judgment and underlying loan.

B. <u>The 2014 Settlement Agreement</u>

It is uncontested that when it acquired Carver's interest in the Property, TD had several options—including pursuing the Carver plan, or staying relief and conducting a foreclosure sale—all of which would have resulted in First Union's immediate loss of the Property. But TD did something else: it voluntarily chose to enter into discussions with First Union and sought an arrangement that would provide First Union with continued occupancy and a real opportunity to find a long term solution, while also protecting its legitimate interests. In this regard, it is uncontested that the parties spent a period of almost five months negotiating such an arrangement. First Union itself described these negotiations as "near constant," "arduous," "extremely intense," and "among the most challenging the professionals have encountered." (App. A0342 ¶ 1.)

At the end of this process, the parties reached agreement on a series of interdependent terms. Most importantly to First Union, the Agreement guaranteed it a clear opportunity to avoid "an outright loss of the Property through a state court foreclosure sale." (App. A0342–43 ¶ 2.) First Union moved under Bankruptcy Rule 9019 for Court Approval of the Agreement. In its accompanying Memorandum of Law, First Union conceded that it "would be unlikely to prevail in state court as it is

4

unaware of any defenses to foreclosure and there has already been a judgment issued and a previous auction sale scheduled and stayed." (Id.) It accordingly requested that Judge Gropper approve the Agreement.

The Agreement's interrelated terms provided for First Union to execute a deed in lieu of foreclosure to be held in escrow by TD and returned only if there was no default and if and when a compromise amount of $1,500,000 was received. Over the course of the year that followed, First Union would retain possession of the Property, and pay monthly "use and occupancy" payments—$9000 a month in 2014, and $9360 a month in 2015.

Payments were due on the first of the month, but TD allowed a grace period until the tenth of the month. In the event of non-payment after the grace period, First Union would be in default, but could then still cure the default with a payment and a late fee by 3:00 p.m. on the last day of the month. The consequences of a default that was not cured varied—for the first 180 days, TD was entitled to notice a foreclosure sale in state court in accordance with the Judgment. First Union's financial advisor, Robert C. Smith, described this provision—in effect buying First Union 180 extra days—as providing "further protection for the debtor" that would give First Union "a _final_ opportunity at redemption." (App. A0366 ¶ 9) (emphasis added).

After 180 days, however, a default and lack of redemption entitled TD to "record the deed in full satisfaction of its claim against the debtor." (App. A0346–47 ¶ 19.) Smith noted that:

5

> This was a <u>heavily negotiated</u> term that gives TD Capital finality in the event of a default after 181 days have passed. . . . The "deed in lieu" construct provides . . . finality while allowing the debtor ample time to explore all available alternatives. . . . While the debtor incurs some risk as to value realization if it defaults prior to June 30, 2015, the debtor could conceivably conduct its own quick sale or auction at any [time] during that period if it sees that its financial condition is materially declining. In such a scenario, the debtor is theoretically no worse off than it would be in a contested proceeding today.

(App. A0366–67 ¶ 10) (emphasis added).

For its part, when discussing the Deed Transaction, First Union specifically stated that the "agreement <u>does not contemplate an actual transfer</u> of the Property outside of a sale or state court foreclosure process <u>unless</u> the Debtor defaults under the Agreement <u>and</u> at least 180 days have passed since this Agreement was approved." (App. A0357 ¶ 45) (emphasis added).

First Union further identified a critical benefit that TD would receive as part of the Agreement—avoiding the "costs and delay of conducting a foreclosure sale"—noting that were TD to have filed a motion to stay relief that it "would likely be granted and a foreclosure sale would occur." (<u>Id.</u> ¶ 47.) In conclusion, First Union noted that rather than reach this result:

> [T]he parties have reached an agreement, subject to this Court's approval, whereby TD Capital will avoid needless costs and litigation, and [First Union] will enjoy new avenues to retain and/or maximize the value of its Property for its benefit and the benefit of all its creditors.

(<u>Id.</u>)

Moreover, the parties agreed to mutual general releases upon carrying out the terms of the Agreement. First Union noted that these releases were "mutually beneficial" and that "[b]oth sides benefit from the disputes among them to be

6

resolved on a <u>final</u> basis under this Agreement." (App. A0354 ¶ 36) (emphasis added).

When finalized, the Agreement was presented to Judge Gropper for review. On June 27, 2014, Judge Gropper held a hearing at which he stated that he had read the entire Agreement and noted that that matter had always been "a very, very difficult case and [that he thought the Settlement] benefited from all the parties involved." (App. A0395.) Additionally, he struck a portion of the Agreement involving Attorneys' Fees.

In his Order approving the Agreement, he stated that the "Bankruptcy Court shall retain jurisdiction over the terms and provisions of the Stipulation" and also that "nothing in the Agreement shall impair the Debtor's state court right of redemption <u>if</u> the Property goes to a foreclosure sale." (App. A0361) (emphasis added). The possibility of a foreclosure sale was clearly, by the terms of the Agreement, limited to a default that occurred within the first 180 days.

Judge Gropper entered his Order approving the Agreement on June 27, 2014. No party appealed.

C. <u>First Union's Default</u>

The first 180 days passed without First Union successfully securing refinancing or selling the building. In May 2015, one month before the compromise payment deadline, however, First Union defaulted on its May "use & occupancy" payment and did not cure it before the end of the month. (App. A0422 ¶ 22.)

7

A representative from TD called Pastor Wilson, First Union's representative, to inform him that he was in default. (App. A0421 ¶ 19.) At Wilson's request, TD extended First Union's deadline to cure the default until June 2, 2015. (App. A1126 ¶ 17.) When the payment did not arrive that day, TD began the process of recording the deed. (App. A0422 ¶ 24.) The deed was finally recorded on June 8, 2015. (Id. ¶ 26.) First Union was subsequently released from any obligation to TD.

First Union has proffered a Development Agreement dated May 31, 2015 with the Thorobird Company ("Thorobird") as evidence of what may be characterized as potential, contingent, forthcoming financial wherewithal. While many facts relating to the Development Agreement were developed at trial, none are material to this decision.[1] Moreover, the Development Agreement was merely the first step towards payment to TD.[2] It is undisputed that TD had not been paid anything at the time of First Union's default.

D. <u>Post-Default Proceedings</u>

In February 2016, approximately eight months after the default, and seven months following recordation of the deed, First Union returned to Bankruptcy Court seeking to reopen the matter—specifically, it sought to extend the stipulated payment delivery date. As Judge Gropper had retired from the bench in the interval

---

[1] This issue was relevant mainly to the question of excusable neglect, and the timing of the actual default. As the issues before this Court are distinct, it devotes very little time to the Development Agreement, despite it being heavily referenced in the opinion here appealed from.

[2] The Development Agreement provided for payment to TD only upon transfer of the Property to Thorobird. This transfer could not occur until many things occurred, including, <u>inter alia</u>, the finalizing of a sale agreement, approval by state court, and the approval of the New York Attorney General.

8

between the approval of the Agreement and that time, the case was heard by Judge Wiles.

Judge Wiles held a hearing on March 9, 2016. (App. A0459.) At that hearing, though First Union had not challenged the ability of TD to record the deed, Judge Wiles stated <u>sua sponte</u> that it was "not entirely clear . . . that that's effective under New York law to eliminate the Church's right of redemption." (App. A0473.) He admitted that the background of the Agreement and facts were "not entirely clear" to him, but in any case directed the parties to research and "brief the issue of whether this arrangement really has extinguished the church's right to redeem the property." (App. A0473–74.) He scheduled a further hearing for April 14, 2016.

After the April hearing, First Union commenced an adversary proceeding seeking, <u>inter alia</u>, a declaration that the Deed Transaction violated Section 320 of the New York Real Property Law and New York common law, and that the provision of the Agreement allowing for such recording was an unenforceable penalty under New York law. Both parties filed for summary judgment. Judge Wiles found triable issues on, <u>inter alia</u>, whether the deed in lieu constituted a mortgage, thereby requiring a right of redemption prior to deed recordation. On April 24 and 25, 2017, the Court held a trial to resolve this issue. On August 4, 2017, Judge Wiles issued a Memorandum Decision and Judgment. While he did not excuse the payment default, he invalidated the Deed Transaction pursuant to RPL § 320—that is, he found the deed in lieu was in the nature of a mortgage and further stated that the deed in lieu constituted an impermissible penalty.

9

II. LEGAL STANDARDS

A. Standard of Review

The district court acts as the first level appellate review for orders from a bankruptcy court. See Fed. R. Bankr. P. 8013. On appeal, the district court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Id. A bankruptcy court's conclusions of law are reviewed de novo and findings of fact are reviewed for clear error. In re Ames Dep't Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009) ("We will determine that a finding is clearly erroneous when we are left with the definite and firm conviction that a mistake has been made") (internal quotation marks and citations omitted). Mixed questions of law and fact are subject to de novo review. AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 209 (2d Cir. 2000).

B. Rule 9019 Motions

Bankruptcy Rule 9019 allows a court to approve a compromise or settlement if it is fair, equitable, and in the best interests of the estate. Fed. R. Bankr. 9019(a); see Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424–25 (1968); In re Purofied Down Products Corp., 150 B.R. 519, 522 (Bankr. S.D.N.Y. 1993). In making that determination, a bankruptcy court must consider a variety of factors:

> (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation, 'with its attendant expense, inconvenience, and delay,' including the difficulty in collecting on the judgment; (3) 'the paramount interests of the creditors,' including each affected class's relative benefits 'and the degree to which creditors either do not object to or

> affirmatively support the proposed settlement'; (4) whether other parties in interest support the settlement; (5) the 'competency and experience of counsel' supporting, and '[t]he experience and knowledge of the bankruptcy court judge' reviewing, the settlement; (6) 'the nature and breadth of releases to be obtained by officers and directors'; and (7) 'the extent to which the settlement is the product of arm's length bargaining.'"

In re Iridium Operating LLC, 478 F.3d 452, 462 (2d Cir. 2007) (quoting In re WorldCom, Inc., 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

Furthermore, the bankruptcy judge has an obligation to make an informed and independent judgment as to whether a proposed compromise is fair and equitable after apprising itself of "all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." TMT Trailer Ferry, 390 U.S. at 434; see also In re Telcar Grp., Inc., 363 B.R. 345, 352 (Bankr. E.D.N.Y. 2007). In so doing, the bankruptcy court examines both substantive and procedural fairness. Weinberger v. Kendrick, 698 F.2d 61, 73 (2d Cir. 1982). The bankruptcy court need not decide each of the numerous issues of law and fact raised by a settlement, but rather should "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983) (quotation marks and alterations omitted). On the other hand, "the court may not simply rubber stamp the recommendation of a trustee or debtor in possession but, instead, must make an independent, 'full and fair assessment of the wisdom of the proposed compromise.'" In re Remsen Partners, Ltd., 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (quoting In re Mrs. Weinberg's Kosher Foods, 278 B.R. 358, 362 (Bankr. S.D.N.Y. 2002).

11

C. New York Real Property Law § 320

New York Real Property Law § 320 states that: "A deed conveying real property, which, by any other written instrument, appears to be intended only as a security in the nature of a mortgage, although an absolute conveyance in terms, must be considered a mortgage." RPL § 320 (emphasis added).

Under New York law, in order to determine whether a deed was given as a security or as an absolute conveyance, a court must look at the intentions of the parties. Maher v. Alma Realty Co., Inc., 70 A.D.2d 931 (N.Y. App. Div. 1979).

Once a court determines that a deed is given as a mortgage, "[t]he holder of a deed given as a security must proceed in the same manner as any other mortgagee—by foreclosure and sale—to extinguish the mortgagor's interest." Leonia Bank v. Kouri, 3 A.D.3d 213, 217–18 (N.Y. App. Div. 2004). Under New York law, the mortgagor retains an absolute right—the right of redemption—to repay a mortgage debt at any time prior to a foreclosure sale. The mortgagor's right of redemption "cannot be waived or abandoned by any stipulation of the parties, even if the waiver is embodied in the mortgage." Patmos Fifth Real Estate Inc. v. Mazl Bldg., LLC, 124 A.D.3d 422, 426 (N.Y. App. Div. 2015); see also Basile v. Erhal Holding Corp., 148 A.D.2d 484, 485–86 (N.Y. App. Div. 1989). The right of redemption is further considered to be unwaivable by parties to a contract, even "by stipulation in open court." Maher, 70 A.D.2d at 931.

However, in Meyerson v. Werner, the Second Circuit held that, even where a settlement agreement providing a deed to one party bears "some aspects of a

12

mortgage," where the parties clearly intend a transaction "not to be treated as a mortgage governed by the . . . provisions of New York law" and such an agreement is in conjunction with a Court order by a court that has "thorough[ly] and careful[ly] consider[ed]" the specific facts of the case involved, it can create an "unusual situation" whereby the Court Order itself provides "adequate judicial protection of the debtor against overreaching" and thus "should be enforced as ordered." 683 F.2d 723, 727–28 (1982).

In Meyerson, plaintiffs were suing defendant for fraud. After a series of settlement agreements under which defendant defaulted, the parties, under the supervision of the magistrate judge, negotiated a settlement in open court, whereby a deed was transferred into escrow and, in the event of a default, the plaintiffs would transfer title to the highest bidder. When defendant later moved to challenge the settlement agreement, arguing that foreclosure was required under New York law, the magistrate found that since the settlement and order "was the result of extended court-administered bargaining between parties represented by competent counsel," that the transfer of the real estate was "enforceable, notwithstanding the provisions of N.Y. Real Property Law § 320, in view of the circumstances, including the intent of the parties and court that the deed would not be challenged as a mortgage." Id. at 726. Upon appeal, the Second Circuit affirmed, calling it an "unusual situation" in which "the court's approval of the specific intention of the parties incorporated in its order provided adequate judicial protection of the debtor against overreaching and should be enforced as ordered." Id. at 728.

13

D. <u>Unenforceable Penalties</u>

Under New York law, a contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation. <u>Truck Rent-A-Ctr. v. Puritan Farms 2nd</u>, 361 N.E. 2d 1015, 1018 (N.Y. 1977). More specifically, if "the amount fixed is plainly or grossly disproportionate to the probable loss, the provision calls for a penalty and will not be enforced." <u>Id.</u> The agreement "should be interpreted as of the date of its making and not as of the date of its breach." <u>Id.</u> at 1019.

III. DISCUSSION

Appellants raise three issues on appeal. First, they contend that the bankruptcy court erred by not enforcing the 2014 Stipulation and Order as written. Second, they contend that the bankruptcy court erred in concluding that the Settlement Agreement violated RPL § 320. And third, they argue that the bankruptcy court erred when it determined that the Deed Transaction constituted an impermissible penalty under New York law.

The Court reviews the Bankruptcy Court's conclusions of law, and mixed conclusions of law and findings of fact <u>de novo</u>; it reviews findings of fact for clear error. The Court will examine each of appellant's arguments.

A. <u>Real Property Law § 320</u>

The Bankruptcy Court found that the Deed Transaction was no more than a mortgage. The center of its analysis lay in the fact that "the parties did not intend to

14

accomplish an absolute conveyance of the Property <u>at the time the deed was delivered</u>." (App. A0013) (emphasis added). It thus found that as a mortgage, it was subject to the right of redemption, and that any agreement to the contrary violated RPL § 320 and was therefore infirm as a matter of law. It further found the <u>Meyerson</u> case to be clearly distinguishable.

This Court disagrees with these determinations. It is clear from the face of the Agreement that it constituted a complex, multi-faceted agreement on a number of terms and was the product of extensive arms-length negotiations. It offered far more than a mortgage or lien on property. Rather, it laid out a comprehensive plan for extending the time in which First Union might be able to retain the property, despite the fact that a judgment of foreclosure had already been obtained. The challenged aspect of the Settlement Agreement—in which TD could record the deed in the event of a default after 180 days—was part of the overall fabric of consideration, and the other terms in the Agreement were interdependent upon this pivotal provision.

As such, the conveyance of the deed represented far more than a mortgage. It was part of an extensively negotiated, judicially-ordered settlement. Moreover, the 180-day mark represented a "heavily negotiated" term that gave finality to TD but also extended First Union's opportunities to refinance or sell the Property. This was highlighted in the briefing and declarations as a lynchpin of the Settlement Agreement.

15

The Meyerson case, far from inapplicable, is directly on point. The nub of Meyerson's holding is that where the parties intend an outright conveyance, at least at some point, a Court-ordered settlement approving such a conveyance will not violate RPL § 320. In that case, plaintiffs had sued defendant for fraud; the parties then "negotiated in open court a settlement," which included, among other things: 1) a lump sum to which plaintiffs were entitled, which was to be paid in regular installments; and 2) the transfer of a deed for a property of defendants—"to be placed in escrow to be delivered to plaintiffs in case of default." Meyerson, 683 F.2d at 726. When defendant did indeed default, he challenged the agreement as violative of RPL § 320. Id. The magistrate judge who had originally approved the settlement held a hearing and found that since the:

> [S]ettlement and order was the result of extended court-administered bargaining between parties represented by competent counsel . . . that the terms of the settlement and order, which required transfer of the real estate to plaintiffs, were enforceable, notwithstanding the provisions of N.Y. Real Property Law § 320, in view of the circumstances, including the intent of the parties and court that the deed would not be challenged as a mortgage.

Id. "Moreover, he concluded that the defendants were estopped by reason of their representations, upon which plaintiff had relied, from denying the effectiveness of the transfer." Id.

The Second Circuit affirmed, finding that "[i]t was the clear intention of the parties, approved and ordered by the district court, that the transaction was not to be treated as a mortgage governed by the foregoing provision of New York law." Id. at 727. Important to the Second Circuit's analysis was the fact that the agreement

16

in that case was the product of extensive negotiation under the supervision of a district court "after thorough and careful consideration," that there was no appeal from the order, and that the protection that RPL § 320 was designed to offer debtors was, in this case, provided by the court's supervision over the settlement.

The Court finds that here, as in Meyerson, Judge Gropper carefully considered the Settlement Agreement, the parties did not appeal, and the Bankruptcy Court's approval of the Settlement Agreement increased, rather than reduced, protection against overreaching creditors. This was a plain benefit that First Union obtained.

Moreover, the terms of the Agreement themselves are not clearly mortgage related. The payments were termed "use and occupancy payments," not mortgage payments, they were not related to the interest rates, and their payment did not affect the total $1,500,000 owed to TD.

The Bankruptcy Court further erred by relying on trial evidence to establish the intent behind the Agreement. The record itself, consisting of the Settlement Agreement, the Hearing Transcript, the Memorandum in Support of the Agreement, the Declaration in Support of the Agreement, and the Order, all clearly evince an intent to look at the Deed Transfer as something more than a mortgage. It was therefore unnecessary to look further. Even if that were not the case, the trial testimony does not clearly establish that the Deed Transfer was intended only as a mortgage.

For all of these reasons, the Court finds that the Bankruptcy Court erred by finding that the Settlement Agreement violated RPL § 320.

17

B. <u>Liquidated Damages Clause</u>

Furthermore, this Court does not find the Deed Transfer to be an unenforceable penalty. The amount fixed (the property value) was certainly not "grossly disproportionate" to the probable loss, especially "as of the date of its making." <u>Truck Rent-A-Ctr.</u>, 361 N.E.2d at 1018–19. Rather, at the time of the Agreement, the property value was likely close to the value of the compromise amount ($1,500,000) though, in all likelihood, even lower.

The Bankruptcy Court's inquiry into the potential developed value of the property, as presented at trial by Thorobird's representative, Campbell, is a distraction from the question at hand—whether at the time the Agreement was reached, the Property value was grossly disproportionate to TD's possible damages.

In addition, given the lack of certainty about the value of the Property at the time of the Agreement, such damages could certainly be considered difficult to ascertain. Indeed, all the facts and circumstances at the time of the Agreement support the Deed Transaction as proportionate to TD's potential damages.

Moreover, as discussed above, the Deed Transaction was an essential part of the Agreement—the product of compromise on both sides, and consideration rendered by each party.

In sum, the Bankruptcy Court erred when it found that the Deed Transaction was a penalty and therefore unenforceable.

18

C. <u>Finality and Estoppel</u>

Appellants also devote a considerable amount of their brief to the argument that Judge Gropper's Order is a final Order entitled to deference and that principles of both judicial and equitable estoppel should bar the relief granted by the Bankruptcy Court.

The Court not need reach this argument, as it has already resolved that the Deed Transaction neither violates RPL § 320 nor is it an unenforceable penalty. However, the Court tends to agree with appellants. The Bankruptcy Court's conclusion that Judge Gropper would, had he read the provision of the Agreement including the Deed Transaction, "undoubtedly . . . refused to approve the result," is not based on any evidence in the record. The Deed Transaction was not hidden in the Settlement Agreement, but prominently featured in the Agreement itself, as well as the accompanying memorandum and declaration. Judge Gropper stated that he had read all of the above, that he was familiar with the long struggle and the extensive negotiations, that the Agreement represented "hard choices," and that he was willing to approve it. There is no indication that he did not review the Agreement as Rule 9019 required him to do.

Moreover, the Court agrees that, having relied upon the Agreement, principles of estoppel should bar First Union from challenging the Agreement now. All the facts in evidence suggest that TD would have foreclosed on the property long ago, or followed the Carver Plan, had it not been relying upon the Agreement and Order.

\*      \*      \*

In sum, the Court finds that the Bankruptcy Court erred in its Memorandum Decision and Opinion of August 4, 2017 and that the decision should be REVERSED to the extent it invalidated the Deed Transaction as violative of RPL § 320 or as an impermissible penalty, and the Judgment that followed VACATED to the extent that it set aside the transfer of the deed to 2064 Grand Concourse LLC and to the extent it invalidated the Deed Transaction as violative of RPL § 320 or as an impermissible penalty.

IV. CONCLUSION

For the reasons set forth above, the decision of the Bankruptcy Court is REVERSED to the extent it invalidated the Deed Transaction as violative of RPL § 320 or as an impermissible penalty, the Judgment that followed VACATED to the extent that it set aside the transfer of the deed to 2064 Grand Concourse LLC and to the extent it invalidated the Deed Transaction as violative of RPL § 320 or as an impermissible penalty, the adversary complaint DISMISSED, and summary judgment GRANTED to the appellants.

The Clerk of Court is instructed to terminate this action.

SO ORDERED.

Dated:    New York, New York
           February 7, 2018

_____
KATHERINE B. FORREST
United States District Judge